Judge Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>SCHUYLER PYATTE BARBEAU,<br><br>Defendant. | NO. CR15-391RAJ<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS** |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Thomas M. Woods, Assistant United States Attorney for said District, respectfully responds to the defendant's motions regarding a justification defense (Dkt. #24), the Second Amendment and Commerce Clause (Dkt. #25), and knowledge of the law (Dkt. #26).

## BACKGROUND

### A. The Firearm

On June 5, 2015 the FBI received information from a Confidential Human Source ("CHS") regarding potential threats to law enforcement made by Schuyler Barbeau. The CHS advised that Barbeau frequently told the CHS that the federal government was not abiding by the principles set forth in the Constitution and that many public servants, such

Response to Defendant's Pretrial Motions - 1
*United States v. Barbeau*, CR15-391RAJ

as judges and police officers who had sworn to uphold it, had deviated from their oath of office.  Barbeau told the CHS that it was his duty to educate public servants who were not living up to their oath and discussed "lynching" those he deemed unworthy if necessary. In one instance, Barbeau told the CHS that he and other like-minded individuals would physically remove a California judge presiding over a misdemeanor weapons violation he received there in the fall of 2014.

The CHS advised Barbeau was always armed with a .45 caliber pistol and frequently traveled with a short-barreled AR-15 rifle ("SBR"), body armor, and a helmet in his vehicle.  On October 19, 2015, Barbeau invited the CHS to a trailer he was occupying in Springdale, Washington, and discussed selling his SBR.  Barbeau asked the CHS to find a buyer for him and allowed the CHS to take several photographs of the SBR.  Barbeau informed the CHS that he willing to sell the SBR along with a longer barrel, optics, and other accessories, for 5,000 dollars.

On November 3, 2015, Barbeau contacted the CHS via telephone with additional information about the sale of his SBR.  During the telephone conversation, Barbeau informed the CHS that he wanted to use the money from the sale to purchase a rifle capable of firing 7.62 millimeter rounds.  Barbeau believed this type of rifle would be more effective in shoot-outs with law enforcement.

On November 8, 2015, the CHS met with Barbeau and informed him that he/she had a buyer interested in purchasing his SBR for the 5,000 dollars Barbeau had asked for previously.  Barbeau told the CHS he would consider the offer.

On November 20, 2015, Barbeau contacted the CHS via a private Facebook message and asked the CHS to tell the buyer he was ready to sell his SBR as soon as possible.  The CHS told Barbeau the buyer was out of town for the upcoming Thanksgiving holiday, but offered to keep the SBR until the buyer returned.  Barbeau agreed to let the CHS keep the SBR and arranged to meet the CHS the afternoon of November 22.

Response to Defendant's Pretrial Motions - 2
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

On the morning of November 22, 2015, Barbeau unexpectedly dropped off the SBR at the CHS's residence in the Western District of Washington and asked the CHS to obtain the money from the buyer as soon as possible.  Shortly after, Barbeau departed the residence, and the CHS contacted the FBI.  Later that same morning, the FBI met with the CHS and took possession of the SBR.

On December 6, 2015, Barbeau was arrested at the Snoqualmie Weigh Station. Barbeau was armed with a pistol.

**B. The Auto Sear**

During the investigation, the CHS advised the FBI that Barbeau spoke on several occasions about manufacturing a "drop in auto-sear" for his rifle.  A drop in auto-sear is a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.  Thus, an auto sear generally is considered a machine gun under federal law, and the use of an auto sear with a firearm generally transforms the firearm into a machine gun as defined by federal law.

On November 8, 2015, Barbeau referenced shooting down a hypothetical law enforcement helicopter and spoke in vague terms regarding his rifle firing in fully-automatic mode.  According to a recording of the meeting, he stated:  "Remember what I have on my rifle.  It ain't no just . . . phew, phew, phew, phew."  The CHS then asked Barbeau:  "Did you get that thing to work?"  Barbeau replied:  "It works, but not good. But it works.  And If I can ever find somebody with a 3D printer…."  Recent developments in 3D printing have allowed individuals the capability to manufacture firearm parts, including auto-sears, using plans that are available on the internet.

On November 20, 2015, the CHS advised the FBI that on that same day, the CHS and Barbeau spoke on the telephone.  This conversation was recorded.  During the conversation, Barbeau and the CHS discussed new rifles that Barbeau was interested in buying.  The CHS asked Barbeau if the auto-sear would work in the new guns being discussed.  Barbeau responded:  "Yeah."

Response to Defendant's Pretrial Motions - 3
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### C. ATF's Examination of the Firearms

An ATF firearms specialist has examined the firearm that Barbeau gave to the CHS. The specialist has concluded that the firearm is a short-barreled rifle, as well as a machinegun. The firearm constitutes machinegun for two reasons. First, the firearm contained the auto-sear device, which the specialist confirmed allowed the firearm to fire fully-automatically. Second, the specialist observed that the firearm fired fully-automatically even without the auto-sear device.

### D. Barbeau's Repeated Threats To Kill Law Enforcement Officers

During the course of the investigation, Barbeau made repeated comments about killing law enforcement officers. On November 4, 2015, during a recorded call, he spoke about the legal troubles of Carrie Aenk, the wife of Allen Aenk, who submitted an affidavit in support of Barbeau's justification motion. Barbeau said: "Forget the court. Wait for them (referring to law enforcement) to come and we'll shoot them." He also said: "The reason nobody has messed with me so far is because I yell and scream to the world that I will shoot people if they don't leave me alone. That's why the FBI contacted the Anacortes Police Department and said 'Beware of this guy, he keeps these guns in his car and with him at all times.' So that an officer doesn't try to think he is gonna do something to me and find out.... I'm going to shoot him." He similarly said, "Is it worth losing two, three, four guys to try to serve an arrest warrant? Is it worth having a bunch of our own guys getting' killed, just to try to bring one guy in?"

On November 20, 2015, Barbeau talked about wanting to acquire a .50 caliber rifle. He talked about militia members potentially being at a disadvantage if law enforcement had armored vehicles or long-range rifles. On October 17, 2015, he said he would never enter a courthouse unless armed in order to "defend" himself from being convicted of an "unconstitutional" law. On October 12, 2015, Barbeau posted on Facebook: "That guy that killed 168, ya he's my hero. Hes the only person I know that didn't like how the federal government is. and actually did something against them."

Response to Defendant's Pretrial Motions - 4
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Barbeau was referring to Timothy McVeigh, who killed 168 people during the Oklahoma City bombing, nineteen of whom were children at a day care facility.

### E.  The Charges

On February 25, 2015, a grand jury returned a superseding indictment charging Barbeau with (1) possessing an unregistered short-barreled rifle and machine gun, in violation of the National Firearms Act, 26 U.S.C. §§ 5861(d), 5845(a)(3), (6) and (2) unlawful possession of a machine gun, in violation of Title 18, United States Code, Section 922(o).

## ARGUMENT

### A.  Barbeau's Justification Defense Is Frivolous

#### 1.  The Ninth Circuit Standard

In order to be entitled to a justification instruction, the defendant bears the burden of showing (1) he was under unlawful and present threat of death or serious bodily injury; (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) he had no reasonable legal alternative; and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. *See United States v. Gomez*, 92 F.3d 770, 775 (9th Cir. 1996); *see also* Ninth Circuit Model Jury Instruction No. 8.66.  Where the defendant is involved in illegal activities and his or her fear is a result of engaging in those activities, the justification defense is not permitted.  *See United States v. Phillips*, 149 F.3d 1026, 1030 (9th Cir. 1998).

A defendant is entitled to "instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility."  *United States v. Lemon*, 824 F.2d 763, 764 (9th Cir. 1987).  "A 'mere scintilla' of evidence supporting a defendant's theory, however, is not sufficient to warrant a defense instruction."  *United States v. Wofford*, 122 F.3d 787, 789 (9th Cir. 1997).  The Ninth Circuit also has cautioned that the justification defense generally is available only in 'exceptional circumstances.'"

Response to Defendant's Pretrial Motions - 5
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*United States v. Beasley*, 346 F.3d 930, 933 (9th Cir. 2003) (quoting *Wofford*, 122 F.3d at 790-91)).

### 2. Barbeau Is Not Entitled to a Justification Instruction

In this case, Barbeau is clearly not entitled to a justification instruction because he **sold** the firearm. As a matter of simple logic, one cannot simultaneously claim the need for a firearm because of the "unlawful and present threat of death or serious bodily injury," yet have disposed of, and sold the firearm.

Second, Barbeau owned a gun, apart from the illegal firearm that he possessed. At the time of his arrest, Barbeau was armed with a pistol. The government has produced to the defense pictures of Barbeau with this firearm as far back as 2014. Thus, even if Barbeau could somehow show that he was "justified" in having a firearm, he was not justified in possessing a second, illegal firearm.

Even if Barbeau could somehow overcome these two obstacles, he cannot otherwise make out the elements of a justification defense. In his affidavit, Barbeau refers to general threats, ranging from terrorism to mass shootings by the mentally ill. These are threats faced by all citizens, and none were "present" threats allowing Barbeau to possess an illegal firearm. *See generally United States v. Sahakian*, 965 F.2d 740, 741 (9th Cir. 1992) (holding that threat occurring 36 days before possession of firearm not "present threat"); *Lemon*, 824 F.2d at 765 (ruling that "present threat" ceased when Lemon's assailant left scene); *Wofford*, 122 F.3d at 790 (no justification defense: last threat occurred within five months of firearm possession).

Barbeau also refers to a robbery incident that occurred at the ranch at which he was staying. Barbeau, however, was not the target of the robbery and it occurred some four months prior to when he sold the gun, prior to him even arriving at the property.[1] Moreover, Barbeau possessed the firearm over a year ***prior*** to the robbery, evidencing that he did not possess the firearm because of this event.

---

[1] Allen Aenk claims that he and his wife received threats in 2014. Even if Mr. Aenk were telling the truth, the threats he relates occurred in 2014 and did not relate to Barbeau.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      Finally, Barbeau disturbingly maintains that he needed firearms for "protection

2 from law enforcement and government."  Under our system of government, disputes with

3 government are resolved in the courtroom or in the legislature—not with the barrel of a

4 gun.  Barbeau was neither under a "present" nor an "unlawful" threat from the

5 government justifying his possession of an illegal firearm.

6      In sum, Barbeau has not carried in his burden in showing he is entitled to a

7 justification instruction.

8      **B. Barbeau's Second Amendment Claims Lack Merit**

9      Barbeau claims that the charges in the Superseding Indictment run afoul of the

10 Second Amendment.  The Ninth Circuit has held that the Second Amendment does not

11 protect the possession of machineguns, even ones that are homemade.  *See United States*

12 *v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("[T]he Second Amendment does not apply

13 to machine guns.").

14      The Second Amendment also does not protect the possession of short-barreled

15 rifles.  *See, e.g.*, *United States v. Gilbert*, 2008 WL 2740453, *2 (9th Cir. July 15, 2008)

16 (unpublished)  ("Under *Heller*, individuals still do not have the right to possess

17 machineguns or short-barreled rifles . . . ."); *United States v. Gonzales*, 2011 WL

18 5288727, at *8 (D. Utah  Nov. 2, 2011) (rejecting claim that short-barreled rifles are

19 protected under the Second Amendment).   The defense's reliance upon *District of*

20 *Columbia v. Heller*, 554 U.S. 570 (2008), is misplaced.  The firearm at issue in *Heller*

21 was a handgun, not a short-barreled rifle.  In explaining the scope of the Second

22 Amendment, the Supreme Court discussed both the nature of possession that is

23 permissible and the sorts of weapons protected by the Second Amendment.  The Court

24 concluded that the Second Amendment addresses only weapons "in common use," and,

25 as an historical matter, the Amendment's scope was tied to the "lawful weapons" that

26 militia members would bring from home "to militia duty."  554 U.S. at 627.  The Second

27 Amendment "does not protect those weapons not typically possessed by law-abiding

28 citizens for lawful purposes . . . ."  *Id.* at 625.

Response to Defendant's Pretrial Motions - 7
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Following *Heller*, the test is not, as the Court explained, whether the weapons are "most useful in military service," an interpretation that would provide a right to keep "M-16 rifles and the like" at home. *Id.* at 627. Rather, the test is whether the weapons are "typically possessed" in the home and "in common use" by "law-abiding citizens for lawful purposes." *Id.* Conversely, the Court found that the Second Amendment has never been construed to protect "the carrying of 'dangerous and unusual weapons.'" *Id.*.

This issue was more specifically identified in the Supreme Court's analysis of its prior decision in *United States v. Miller*, 307 U.S. 174 (1939). In *Miller*, the defendants had been indicted under the National Firearms Act of 1934 for transporting in interstate commerce an unregistered sawed-off shotgun. In *Heller*, the Supreme Court re-affirmed that the *Miller* decision turned on the fact that the type of weapon at issue there—a sawed-off shotgun —was not eligible for Second Amendment protection. *Id.* at 625. The *Heller* Court said, "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* The *Heller* Court then considered what types of weapons are protected under the Second Amendment, writing:

> We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits. Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. ***We***

Response to Defendant's Pretrial Motions - 8
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*therefore read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.* That accords with the historical understanding of the scope of the right . . . .

*Id.* (internal citations omitted and second emphasis added).

The *Heller* Court's references to the fact that weapons like short-barreled shotguns and machine guns do not fall within the scope of the Second Amendment right make clear that the indictment in this case does not infringe on any constitutional right of the defendant to possess a short-barreled rifle. Such a weapon is not akin to a handgun, the type of weapon that individuals have a right to maintain in their homes for self-defense under *Heller*. Indeed, *Heller* and *Miller* make clear that a firearm such as a short-barreled rifle is not covered by the Second Amendment. The obvious potential for substantial public safety risks presented by a short-barreled rifle plainly supports that conclusion.

Typical handguns meet the test of "common use" and regular possession in the home, and it is this feature that brings handguns, as a class of arms, within the scope of the Second Amendment. The firearm here, however, does not meet the threshold for a type of firearm that is within the protection of the Second Amendment. It is neither a weapon in "common use" nor a weapon that people would typically possess in the home for lawful purposes like self-defense. Rather, the weapon at issue here is the sort of "dangerous and unusual" weapon that has historically stood outside of the right to bear arms. *Id.* at 627. As one court noted, "Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection.'" *United States v. Gonzales*, No. 2:10-CR-00967 CW, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011) (quoting S. Rep. No. 90–1501, at 28 (1968)).

Since *Heller*, the Ninth Circuit treated the validity of restricting machine gun and short-barrel rifle possession as sufficiently obvious that the court found no error in a jury instruction that stated:

Response to Defendant's Pretrial Motions - 9
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

> A person does not have the right under the Second Amendment, or under any other provision of the Constitution, to possess a machinegun.  A person does not have a right, under the Second Amendment, or under any other provision of the Constitution, to possess a rifle with a barrel shorter than 16 inches that the person has not registered in the National Firearms Registration and Transfer Record.

*Gilbert*, 2008 WL 2740453, at *1 (unpublished).  The Ninth Circuit observed: "Under *Heller*, individuals still do not have the right to possess machineguns or short barreled rifles, as Gilbert did, and convicted felons, such as Gilbert, do not have the right to possess any firearms."  *Id.* at *2 (unpublished).  That conclusion follows directly from *Heller*'s discussion of the sorts of weapons that are and are not protected by the Second Amendment.

In sum, Barbeau's possession of a machine gun/short barreled-rifle was not protected by the Second Amendment.

### C. Barbeau's Commerce Clause Claim Is Foreclosed by Binding Ninth Circuit Authority.

Barbeau claims that section 922(o), the prohibition on machine guns, runs afoul of the Commerce Clause.  As Barbeau recognizes, his claim is squarely foreclosed by *United States v. Henry*, 688 F.3d 637, 641 (9th Cir. 2012), which held that Congress had the authority under the Commerce Clause to regulate even homemade machine guns.

### D. Barbeau Is Not Entitled to a Mistake of Law Instruction

Barbeau seeks an instruction requiring the government to prove that Barbeau knew that it was illegal for him to possess a machinegun and a short-barreled rifle, without registration.  As Barbeau recognizes, his contention is foreclosed by binding Ninth Circuit precedent.  *See United States v. Summers,* 268 F.3d 683, 688 (9th Cir. 2001); *United States v. Gergen,* 172 F.3d 719, 725 (9th Cir. 1999); *United States v. Gravenmeir*, 121 F.3d 526, 530 (9th Cir. 1997).  The government need only prove that Barbeau was aware of the specific characteristics of the firearm that make it a machinegun and a short-

Response to Defendant's Pretrial Motions - 10
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

barreled rifle.  *Id.*  The government need not prove that Barbeau was aware that it was illegal to possess the firearm.

## **CONCLUSION**

For the foregoing reasons, Barbeau's motions should be denied.

DATED:  February 29, 2016

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney


*/s/ Thomas M. Woods*
THOMAS M. WOODS
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone:  (206) 553-7970
Fax:  (206) 553-0755
E-mail:  thomas.woods2@usdoj.gov

Response to Defendant's Pretrial Motions - 11
*United States v. Barbeau*, CR15-391RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## CERTIFICATE OF SERVICE

2       The undersigned hereby certifies that he is an employee in the Office of the United

3  States Attorney for the Western District of Washington and is a person of such age and

4  discretion as to be competent to serve papers;

5       It is further certified that on February 29, 2016, I electronically filed the foregoing

6  document with the Clerk of the Court using the CM/ECF system, which will send

7  notification of such filing to the CM/ECF participants.

8

9

10                                          */s/ Thomas M. Woods*
                                           THOMAS M. WOODS
11                                         Assistant United States Attorney
                                           United States Attorney's Office
12                                         700 Stewart Street, Suite 5220
                                           Seattle, Washington 98101-1271
13                                         Phone:  (206) 553-7970
                                           Fax:   (206) 553-0755
14
                                           E-mail:  thomas.woods2@usdoj.gov
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Response to Defendant's Pretrial Motions - 12
*United States v. Barbeau*, CR15-391RAJ